# In the United States Court of Federal Claims

No. 15-156C
(Filed:  November 25, 2015)*
**\*Opinion originally filed under seal on November 13, 2015**

|  |  |
|---|---|
| KWR CONSTRUCTION, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

Post-Award Bid Protest; Price
Realism; Small Business
Administration; Responsibility
Determination

_Anne E. Carl_, Bisbee, AZ, for plaintiff.  _John A. MacKinnon_, Bisbee, AZ, of counsel.

_Matthew P. Roche_, Civil Division, United States Department of Justice, Washington, DC, with whom were _Benjamin C. Mizer_, Principal Deputy Assistant Attorney General, _Robert E. Kirschman, Jr._, Director, and _Franklin E. White, Jr._, Assistant Director, for defendant.  _Erika L. Whelan Retta_, Air Force Legal Operations Agency, Joint Base Andrews, MD, of counsel.

## O P I N I O N

**FIRESTONE**, _Judge_.

Pending before the court are the second set of motions for judgment on the

administrative record filed by plaintiff, KWR Construction, Inc. ("KWR"), and defendant

the United States ("the government"), in connection with the United States Air Force's

("the agency") award of four firm-fixed-price indefinite-delivery-indefinite-quantity

("IDIQ") multiple award construction contracts ("MACCs") for Luke Air Force Base,

Gila Bend Air Force Auxiliary Field, and Ft. Tuthill Recreational Area near Phoenix,

Arizona (together, "Luke AFB").[1]   At issue in these motions is the agency's fourth

evaluation of KWR's proposal.  In its first review, the agency evaluated KWR's offer

favorably.  Following an amendment to the solicitation, KWR reduced its price proposal

and the agency conducted a second review.  In its second review, the agency found that

KWR's revised price proposal was unacceptable and therefore not eligible for one of five

potential MACC awards.  In its decision to eliminate KWR from the competition, the

agency determined that KWR's technical proposal was acceptable but KWR's revised

price proposal was not complete and was both unreasonable and unrealistic.

Administrative Record ("AR") 1634.  This court, on review, vacated that decision and

remanded the matter to the agency for another evaluation or explanation.  See KWR

Constr., Inc. v. United States, No. 15-156, 2015 WL 4463255, at *8-9 (Fed. Cl. July 21,

2015).[2]   Following the remand, the agency undertook a third evaluation of KWR's price

proposal.  After that evaluation was completed and was again challenged by KWR, the

agency sought a voluntary remand to undertake a fourth evaluation of KWR's price

proposal.  The court granted the government's request.

    In its fourth evaluation of KWR's price proposal, the agency has again determined

that KWR's offer must be rejected, this time on the grounds that KWR's price proposal is

---

[1] The RFP provided for an award of three to five contracts and was set aside as a section 8(a) procurement for small businesses in Arizona.  AR 118.

[2] See also Equa Sols., Inc. v. United States, 120 Fed. Cl. 371, 373 (2015) (rejecting a separate bid protest under the same solicitation).

"unrealistic" and "do[es] not reflect a clear understanding of the requirements, as it relates to pricing, and presents an unacceptable risk to both the government and the contractor." AR 6037-38. In the pending cross motions, the parties dispute whether the agency's latest decision to eliminate KWR from the competition is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Briefing was completed on October 19, 2015 and oral argument was held on October 29, 2015. For the reasons that follow, the court finds that the agency's price realism analysis was not consistent with the solicitation's requirements and is not supported by the record. The court also finds that the agency's rejection of KWR on the grounds that KWR presented a risk to the government and to itself amounts to a de facto "responsibility determination," and therefore the agency was required to refer the matter to the Small Business Administration ("SBA"). Accordingly, KWR's motion for judgment on the administrative record is **GRANTED** and the government's cross-motion for judgment on the administrative record is **DENIED**.

## I.      Background

### A.      Relevant Provisions of the Original Solicitation

The Request for Proposals, Solicitation No. FA4887-13-R-0005 ("RFP" or "solicitation") stated that the decision to award from three to five firm-fixed-price IDIQ MACCs for construction projects at Luke AFB would be based on an evaluation of technical acceptability, price, and past performance. AR 118, 174-77, 180, 188. With respect to technical acceptability, the RFP identified three subfactors. First, the RFP stated that offerors would be evaluated on their technical approach to a demonstration

project to renovate a server room, including the installation of upgraded mechanical and

electrical equipment, upgrading a server rack system, and upgrading interior finishes, in

accordance with the government's procedural specifications and demonstration project

statement of objectives.  AR 174, 184.  Second, the RFP provided that the government

would evaluate the offeror's architect and engineer team plan.  AR 184.  Third, the RFP

stated that the government would evaluate the offeror's management plan on the basis of

resumes for a project manager, superintendent, quality control manager, and safety

officer.  Id.  The RFP explained that the government would assign each offer an overall

rating for this factor of "acceptable," if the proposal clearly met the minimum

requirements for the solicitation, or "unacceptable," if it did not.  AR 174.

    With regard to price, the RFP provided that the government would assess each

offeror's price proposal for the demonstration project "for completeness, price

reasonableness, and price realism."  AR 185.  The RFP directed offerors to justify their

proposed price for the demonstration project by completing a construction cost

breakdown form.  AR 179.  The RFP provided that the government would consider

whether "[a]ll information/data required by the solicitation has been submitted" to

determine completeness.  AR 186.  The RFP provided that price reasonableness would be

determined based on a comparison of the total proposed price for the demonstration

project to historical prices for similar efforts, a comparison to the Independent

Government Estimate ("IGE"),[3] and price competition obtained by the other offerors'

---

[3] As discussed in greater detail infra, the IGE includes "direct" costs, covering materials, labor, and other direct costs, for architectural work (nine line items totaling [. . . ]), electrical work

proposals.[4]  AR 186.  With respect to price realism, the RFP stated that the government would "evaluate the individual line items of the demonstration project price proposal to determine whether prices are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the various elements of the offeror's technical proposal."  AR 183.  The RFP further stated:  "Unrealistically low or high prices may be grounds for eliminating a proposal from competition on the basis that the offeror does not understand the requirement."  AR 186.

Finally, with respect to past performance, the RFP explained that the contracting officer would assign each proposal an overall performance confidence assessment rating of "Substantial Confidence, Satisfactory Confidence, Limited Confidence, No Confidence, or Unknown Confidence" based on an evaluation of recent and relevant performance.  Id.

---

(thirty-three line items totaling [ . . . ]), mechanical work (nine line items totaling [ . . . ]), and "general conditions" (fourteen line items, including design work and project management, totaling [ . . . ]).  AR 2-8.  The IGE also includes "indirect" costs for overhead ([ . . . ]), profit ([ . . . ]), tax ([ . . . ]), and bonding ([ . . . ]).  Id.  The total demonstration project price listed in the IGE is [ . . . ], including [ . . . ] that is not explained in the record.  Id.  The record notes that "[t]he line items and quantities [in the IGE] were developed from past history and future requirements.  Cost was derived from market research and past and current contract expenditures."  AR 1.  The record also states that the IGE assumes "[t]hat there will not be any significant change in material costs and the contract will be awarded before pricing is dated."  Id.  The government further provided that the IGE "is a rough order of magnitude estimate" and that "[a]ctual costs can be obtained by sending drawings out to contractors for actual pricing."  AR 3.

[4] The RFP also noted that the contracting officer had "determined that there is a high probability of adequate price competition in this acquisition" and that "price analysis will be performed using one or more of the techniques defined in FAR 15.404-1 to determine the reasonableness of the offeror's price proposal."  AR 173.

Under the terms of the RFP and the agency's source selection plan, a source selection evaluation board (SSEB) would perform the evaluations of offers and the source selection authority would be responsible for making "an integrated assessment best value award decision."  AR 61-88, 189.

### B.    Amendments 1-8, Initial Proposals, and First Evaluation

The government issued eight amendments to the RFP in late June and early July 2013, before initial proposals were due.  AR 194-241, 253.  Among other things, these amendments provided responses to requests for information and extended the RFP closing date to August 5, 2013.  AR 194-241.

By August 5, 2013, the agency had received twenty-five proposals in response to the RFP.  AR 1447-49, 1630-31.[5]  The agency completed its first evaluations on or around February 14, 2014.  AR 1449.  In its first evaluation, the agency determined that KWR's technical proposal was acceptable and that its price proposal was complete, reasonable, and realistic.  See AR 1948 n.1, 1953 n.4.  KWR also received a performance confidence rating of "substantial confidence."  AR 1953 n.4.

### C.    Amendment 9, Revised Proposals, and Second Evaluation

The government issued Amendment 9 on April 23, 2014.  AR 242-48.  Due to the delay between the RFP's closing date and the agency's completion of evaluations,

---

[5] The total price of KWR's initial proposal to complete the demonstration project was [ . . . ]. AR 677-78.  This price included approximately [ . . . ] for materials, [ . . . ] for labor, and [ . . . ] for indirect costs.  Id.  KWR's initial price proposal included approximately [ . . . ] for electrical work.  Id.  The largest items in KWR's price proposal for electrical work were [ . . . ] for "APC Equipment/PDU/UPS/Racks" (line item 14) and [ . . . ] for four electrical load studies (line item 4).  Id.; see also AR 6034-35.

Amendment 9 requested that offerors resubmit key personnel resumes and revise pricing if needed.  AR 242, 1367.  Amendment 9 "noted that any unit price changes in response to Factor 2 – Price Proposal shall include detailed explanations for any resultant unit price changes to the price proposal submission."  AR 243.  The response period for Amendment 9 closed on April 30, 2014; twenty-four of the original twenty-five offerors, including KWR, submitted a response in a timely manner.  AR 1367.

On April 30, 2014, KWR submitted a revised construction cost breakdown form, AR 781-82, with the following explanation:  "[KWR] appreciates the opportunity to update our Price Proposal to reflect current commodity conditions and labor hour estimates.  Our overhead factors have recently changed due to current volume of work in progress.  We have lowered our profit margin in order to be as competitive as possible."  AR 780.[6]

Kevin Haponek, the SSEB Chair, and Eric Hinsch, the contracting officer, prepared a proposal analysis report, signed on July 15, 2014.  They found that KWR's proposed price was incomplete, unreasonable, and unrealistic.  AR 1416, 1476.[7]  A

---

[6] In its revised offer, KWR reduced its proposed price from [ . . . ] to [ . . . ].  AR 781-82, 6033-38.  KWR's revised price proposal includes approximately [ . . . ] for materials, [ . . . ] for labor, and [ . . . ] for indirect costs.  AR 781-82.  Based on the government's table, KWR's revised price proposal includes approximately [ . . . ] for electrical work, AR 6034; KWR asserts that the actual amount in its price proposal for electrical work is [ . . . ].  See Pl.'s Reply 16-17.  KWR's revised price proposal includes [ . . . ] for APC Equipment/PDU/UPS/Racks (line item 14) and [ . . . ] for one electrical load study (line item 4).  AR 781-82, 6034-35.  KWR also submitted current resumes for its project management positions.  AR 783-90.

[7] In relevant part, the July 15, 2014 proposal analysis report explains that the SSEB found that KWR's price proposal was unrealistic because KWR's "material and labor cost alone is [ . . . ] less than the IGE.  [KWR's] average labor rate is [ . . . ] less than IGE and other offers.  Based on the TEP [total evaluated price], it is unrealistic that KWR can accomplish the demonstration

briefing document dated July 18, 2014 reflects the same determination.[8]  The source

selection decision document (SSDD), dated July 23, 2014 and signed by Major Rochelle

Smith, who was delegated the responsibilities of the source selection authority, describes

the government's evaluation results for KWR and the other offerors but does not explain

the government's rationale.  AR 55, 1634.

On July 28, 2014, the government awarded the following contracts under the RFP:

Contract No. F4887-14-D-0002 to Herman Construction Group, Inc. ("Herman"),

Contract No. FA4887-14-D-0003 to Rore, Inc. ("Rore"), Contract No. FA4887-14-D-

0004 to Mirack & Macro-Z Technology ("M&M"), and Contract No. FA4887-14-D-0005

to Premier Engineering Corporation ("Premier").  AR 1638-1817.[9]

---

project."  AR 1416, 1476.  The July 15, 2014 proposal analysis report states that the government
evaluated proposals between August 6, 2013 and May 2, 2014.  AR 1442.  Handwritten notes
from an evaluation of KWR's price proposal, dated June 18, 2014 and June 20, 2014, show that
the evaluator believed KWR's overall price proposal met the requirements of the solicitation but
there are check marks indicating that KWR's price was and was not reasonable and realistic.  See
AR 1186-87.

[8] "KWR's proposed [ . . . ] [sic] via a construction cost breakdown for the demonstration project.
The offeror failed to include pricing for roof work, the Netshelter SX enclosure, test & balance
(air or CFMs), and training and asbuilts.  The offeror's price was unreasonably low.  The
offeror's price was [ . . . ] lower than IGE and [ . . . ] lower than the average of the proposed
Technically Acceptable offeror's.  This price is not reasonable.  The offeror's material and labor
cost alone is [ . . . ] less than the IGE.  The offeror's average labor rate is [ . . . ] less than IGE
and other offers.  Based on the TEP, it is unrealistic that KWR can accomplish the demonstration
project at this price.  The Government evaluated the offeror's price proposal and determined it to
be incomplete, unreasonable, and unrealistic."  AR 1585.

[9] KWR received a notice, dated July 28, 2014, that its offer was not selected for an award.  AR
1836-37.  On August 11, 2014, the government provided KWR with a debriefing that described
the government's rationale.  AR 1882.  The debriefing document explains that KWR's price
proposal was not realistic because "[KWR] failed to price test & balance (air or CFMs), training,
and asbuilts in accordance with their technical approach.  [KWR] did not reflect a clear
understanding of the requirements."  AR 1899.  The debriefing document also highlights that
KWR's total price of [ . . . ] is [ . . . ] less than the IGE's total price and [ . . . ] less than the

II.     **KWR's Post-Award Challenges**

A.      **Agency and GAO Protests**

On August 8, 2014, KWR filed an agency-level protest.  See AR 5614-44.  Among

other issues, KWR asserted that its price proposal was realistic.  The agency denied

KWR's protest on November 7, 2014.  AR 5645-57.[10]

On November 17, 2014, KWR challenged the agency's decision at the United

States Government Accountability Office ("GAO").  AR 1904-42, 1982-2020.  Among

its contentions, KWR argued that in rejecting KWR's price as "too low" the agency had

made a de facto responsibility determination contrary to the Small Business Act and the

Federal Acquisition Regulations ("FAR").  AR 5748-58, 5786-88.  The Small Business

Act and the FAR require a contracting officer, in certain circumstances, to refer to the

SBA a determination that a small business offeror is not "responsible."  See 15 U.S.C. §

---

average price for the four awardees.  AR 1900.  Finally, the briefing document states that the
total price proposed by each awardee was closer than KWR's price to the IGE and the average of
technically acceptable offers.  Id.

[10] The agency's response to KWR's protest stated that "KWR's Price Proposal was unrealistic
due to inconsistencies between the Technical Volume and Price Proposal."  AR 5651.  First, the
agency "found a major inconsistency with regard to the labor rates associated with work to be
performed on HVAC equipment," and concluded that "[t]he [g]overnment determined that the
variance between KWR's proposal and the minimum rate required by the Davis-Bacon Act made
KWR's Price Proposal unrealistic."  AR 5651-52.  In addition, the government stated that
"KWR's Price Proposal failed to include a Server Rack Installation, as detailed in the Technical
Approach."  AR 5652.  KWR argued that this was line item 14 of its price proposal, titled "APC
Equipment/PDU/UPS/Racks," but the government concluded that "without further
documentation to support this claim, as proposed, the [g]overnment was unable to adequately
deduce this conclusion from KWR's response to Amendment 009."  Id.

637(b)(7); FAR § 19.602-1.  As part of the agency's argument that it did not circumvent the requirements of the Small Business Act, the agency stated that:

> KWR's argument assumes that KWR's price proposal was found to be unacceptable simply because it was too low.  As the agency has demonstrated multiple times, and as the documents in the record show, KWR's price proposal was not determined to be unacceptable merely because it was too low. . . .  The record reflects that the [agency] found KWR's price to be unacceptable because it was incomplete (and thus also unrealistic and unreasonable), because it was not apparent to the agency that KWR had included prices for the Netshelter SX enclosure, Test and Balance, As-Builts and Training, and because of concern with KWR's low labor rates.

AR 5866.  Without reaching the merits, the GAO dismissed KWR's protest because another disappointed offeror under the solicitation had filed a protest with this court.  AR 5964-66; see also KWR Constr., Inc., B-409848.4 (Comp. Gen. Jan. 28, 2015).

## B.    Protest in this Court

On February 18, 2015, KWR filed its original complaint in this court.  On March 23, 2015, after reviewing the parties' briefs and hearing oral argument, the court vacated and remanded the agency's decision to reject KWR based on its price proposal because the government's rationale was inaccurate in several respects and conflicting in others.  See KWR Constr., 2015 WL 4463255, at *8-9.  Specifically, several issues identified by the agency appeared to be no longer of concern, such as "missing" items that were in fact included in KWR's price proposal or did not need to be included as separate line items under the terms of the RFP.  See id. at *7-8.  The court directed the agency, on remand, to provide a reasoned explanation for its rejection of KWR's price proposal or adopt a different decision with a reasoned explanation.  See id. at *8.  Under either approach, the

agency was expected to address (1) why the agency chose to focus on different items in the various rationales for rejecting KWR's price proposal; (2) how the price evaluation completed by the evaluators became the rationale stated in the decision; (3) whether the agency considered KWR's explanation of the post-amendment reductions in its price and what aspects of the proposal caused it to be deemed unreasonable; (4) how the agency compared KWR's price proposal to the IGE; and (5) whether the agency considered all of the factors required in the solicitation, including historical prices, the IGE, and comparative prices, in making its price reasonableness determination.  See id. at *7-8.

### 1.     Third Evaluation (Re-Evaluation on Remand)

On remand, KWR's price proposal was re-evaluated by Tauny Woo, a member of the source selection team who had not previously evaluated KWR's price proposal, and Mr. Hinsch, the contracting officer.  AR 5975.  In a memorandum for the court, dated April 6, 2015, Ms. Woo and Mr. Hinsch concluded that KWR's price proposal was complete and reasonable but not realistic.  AR 5968.

On April 15, 2015, KWR filed a challenge to the government's decision on remand.  On June 9, 2015, the government filed a motion for voluntary remand so the full SSEB could perform a re-evaluation of KWR's price proposal and the source selection authority could make a decision as required by the RFP.  On June 10, 2015, the court granted the government's motion for voluntary remand.

### 2.     Fourth Evaluation (Re-Evaluation on Voluntary Remand)

On June 23, 24, and 25, 2015, the three members of the SSEB re-evaluated KWR's post-Amendment 9 price proposal.  AR 5976-83.  A revised SSDD was signed on

June 26, 2015 by Major Smith and Colonel Richard Ward, the "clearance approval authority." AR 6071. In the revised proposal analysis report and the revised SSDD, both dated June 26, 2015, the government concludes that KWR's proposal was technically acceptable, which the proposal analysis report describes as "clearly show[ing] a technical understanding of the demonstration project." AR 6011, 6067. The government also states that KWR's price proposal is complete, which under the terms of the RFP means that KWR submitted all of the information required by the solicitation, AR 186, and reasonable, which the RFP defined as consistent with historical prices for similar efforts and the IGE, and in consideration of price competition from other offerors. AR 186, 6033-38, 6068. However, the government determined that KWR's price proposal is unrealistic and eliminated KWR from the competition. As noted above, under the terms of the RFP this means that KWR does not understand the requirements of the demonstration project. AR 186, 6033-38, 6068.

The June 26, 2015 SSDD does not explain the basis for KWR's price realism rating but states that "[d]etails pertaining to the individual elements of the price evaluation can be found in further detail within the Proposal Analysis Report." AR 6067-68. The June 26, 2015 proposal analysis report explains that Ms. Woo, who is now the SSEB Chair, and Mr. Hinsch, the contracting officer, reviewed the evaluations performed by the SSEB members and found that:

> KWR's price proposal is unrealistic. Given the comparisons made above, KWR's total evaluated price is [ . . . ] lower than the IGE, and [ . . . ] lower than the technically acceptable average. When taking into consideration a comparison at only the Direct Cost Level (Material, Labor, and Other Direct Cost), KWR's price proposal is [ . . . ] lower than the same

value found in the IGE.  The significant differences between KWR's price and the IGE and other proposers is a key component in determining price realism.  These price disparities do not reflect a clear understanding of the requirements, as it relates to pricing, and presents an unacceptable risk to both the government and the contractor.  The consequence of such a situation is loss of time, money and potential delays due to the potential for contractor default.  KWR's submitted price offsets what is an otherwise well written, technically acceptable proposal.

AR 6037.

The proposal analysis report states further that:

KWR is [ . . . ] lower than the cost allocated for Mechanical work when compared to the IGE, [ . . . ] lower than the cost allocated for Electrical work when compared to the IGE, and [ . . . ] lower than the cost allocated for General Conditions work when compared to the IGE. Individually, Mechanical and General Conditions do not render serious concern when compared to the averages.  Additionally, because the IGE's General Conditions include unnecessary design costs, it would be unfair to fault KWR based on its General Conditions amount, and we do not do so. However, given the vast departure from comparison points, we agree with the evaluators that KWR's price for Electrical work is not realistic because it does not demonstrate a clear understanding of the requirement.  Coupling Mechanical with the Electrical work increases our concern as to the realistic nature of the prices provided.

AR 6038.

Finally, the report states:

We also agree with the evaluators that KWR did not adequately detail all of its price reductions as a result of Amendment 0009, nor did it adequately detail the rationale for the reductions.  In addition to the findings made by the evaluators, we note that KWR's rates for Project Management (Project Manager, Superintendent, Safety/Quality Control Manager) showed significant reductions that were not explained ([ . . . ]/hr to [ . . . ]/hr; [ . . . ]/hr to [ . . . ]/hr; [ . . . ]/hr to [ . . . ]/hr), while KWR did not show any reductions in Project Management hours, as the Amendment 0009 cover letter states.  KWR made assumptions that they will or do have other contracts in place at Luke AFB that would help reduce potential costs. However, relying on other projects increases the risk of an under-supervised development project.  Prices based on such assumptions are not

realistic as other projects and task orders are not predictable.  It was additionally noted that these rates are neither consistent with the reduction rationale nor realistic of a rate paid for these construction supervisor positions in Phoenix, Arizona.

Id.[11]

The June 26, 2015 proposal analysis report concludes that:

> The provided price is complete, reasonable, and unrealistic based on the total evaluated price compared to the [IGE], and price competition obtained by the other offerors' proposals submitted in response to the RFP. [KWR's] proposed price did not represent a realistic price that a person would pay in a competitive business environment.

Id.

### 3.    Amended Complaint and Pending, Second Cross-Motions for Judgment on the Administrative Record

KWR filed an amended complaint (ECF No. 88) on July 27, 2015 and a second

motion for judgment on the administrative record (ECF No. 115) on August 26, 2015.

KWR argues that the government's fourth evaluation failed to follow the requirements of

the RFP.  KWR explains that by assessing KWR's total proposed price instead of the line

items in its price proposal, the agency improperly applied criteria the RFP said would be

used for the price reasonableness analysis in conducting the price realism analysis.  KWR

contends that the RFP required the agency to conduct a line by line evaluation of its price

proposal and that, had the agency done so, the agency would have seen that KWR's

individual line item costs for electrical work, which in the agency's latest decision was

the only price differential of real concern, were comparable to its pre-Amendment 9

---

[11] This explanation is repeated in the government's revised "MACC award clearance briefing" document, which is also dated June 26, 2015.  See AR 6214.

proposal, which the agency deemed acceptable.  KWR also asserts that had the agency conducted a line by line analysis, it would have seen that KWR did understand the project requirements because KWR provided a realistic price for each item.  In addition, KWR argues that the agency's conclusion that KWR's price did not reflect an understanding of the demonstration project requirements is arbitrary and capricious because KWR's understanding of the demonstration project is demonstrated by the agency's other determinations in the record, including the agency's findings that KWR's technical proposal was acceptable and its price proposal was complete and reasonable.  In this connection, the other price proposals that the agency rejected as unrealistic were also found to be incomplete and unreasonable.  See AR 6067-68.

Finally, KWR argues that the government's rejection of its proposal was in fact based on concerns about KWR's ability to perform the contract at the price provided and was therefore a de facto responsibility determination requiring referral to the SBA.  See 15 U.S.C. § 637(b)(7); FAR § 19.602-1.  Specifically, KWR argues that under the terms of the RFP the agency could not reject its price proposal on the basis that KWR presented a risk at the price proposed.  The agency could only reject KWR's proposal on the grounds that KWR did not understand the work.  Issues associated with risk of performance at the price offered go to responsibility, according to KWR, and under the Small Business Act and the FAR had to be resolved by the SBA.

In support of its second cross-motion for judgment on the administrative record (ECF No. 134), the government argues that the agency followed the requirements of the solicitation and reasonably concluded on the record that KWR's price proposal did not

reflect an understanding of the demonstration project requirements.  The government

asserts that the RFP "does not set forth the techniques or methodology that the agency

could use to perform the [price realism] analysis" and, therefore, the agency acted within

its discretion by comparing KWR's total price with the IGE and other proposed prices.

Def.'s Reply at 7-8.  The government further argues that "any finding that a price is

unrealistically low or high is entirely discretionary" because the RFP stated that

"[u]nrealistically low or high prices may be grounds for eliminating a proposal from

competition on the basis that the offeror does not understand the requirement."  Id. at 18

(quoting AR 186).  In addition, the government argues that the agency did not make a "de

facto" responsibility determination and, even if it did, SBA review of KWR's

responsibility would not have been appropriate because a contracting officer is only

required to refer a potentially non-responsible small business offeror to the SBA if the

offeror is "apparent[ly] successful."  Def.'s Reply 2-7 (citing FAR 19.601(c)).  At oral

argument, counsel for the government also argued that referral to the SBA is not

necessary in this case because the RFP put offerors on notice that the agency would

evaluate risk as part of the price realism analysis.  Oral Arg. Tr. 46-47.  Finally, the

government argues that even if KWR succeeds on the merits, its request for injunctive

relief must be denied because any irreparable injury is limited to the lost opportunity to

compete, which would "impermissibly equate[] the irreparable injury prong with success

on the merits."  Def.'s Reply at 26.

### III.    Jurisdiction and Standing

This court exercises jurisdiction over KWR's post-award bid protest pursuant to 28 U.S.C. § 1491(b).  KWR has standing as an "interested party" under 28 U.S.C. § 1491(b) because KWR was an actual bidder that has a direct economic interest, meaning that it was prejudiced by the award.  See CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015).  In order to establish a direct economic interest or prejudice in the context of a post-award bid protest, a party must show that it had a "substantial chance" of receiving the contract.  Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1382 (Fed. Cir. 2012) (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358-59 (Fed. Cir. 2015).  Here, KWR's technical proposal was deemed acceptable, AR 6011-12, and KWR previously received a performance confidence rating of "Substantial Confidence."  AR 1953 n.4.  But for the challenged price realism assessment, KWR's price proposal would have been the lowest priced offer to be deemed complete, reasonable, and realistic.  See AR 6068.  The RFP states that the government contemplated making three to five awards and the record shows that the government awarded four contracts.  Thus, an additional contract could be awarded to KWR under the terms of the RFP.  AR 118, 1638-1817.[12]  Therefore, the court finds that KWR had a

---

[12] Additionally, the RFP was set aside for section 8(a) small businesses in Arizona and the government does not dispute that KWR meets this requirement.

substantial chance of receiving a contract under the solicitation if the alleged errors in the

agency's price realism analysis are resolved in KWR's favor.

## IV.    Standard of Review

In a bid protest case, the standard of review of an agency's action is governed by

the Administrative Procedure Act, 5 U.S.C. § 706.  See 28 U.S.C. § 1491(b)(4).  This

standard is "highly deferential."  Advanced Data Concepts, Inc. v. United States, 216

F.3d 1054, 1058 (Fed. Cir. 2000).  The court may not set aside an agency's action unless

the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252

(Fed. Cir. 2015) (quoting Savantage Fin. Servs. v. United States, 595 F.3d 1282, 1285

(Fed. Cir. 2010)).  In that connection, "[t]he court's task is to determine whether '(1) the

procurement official's decision lacked a rational basis; or (2) the procurement procedure

involved a violation of regulation or procedure.'"  Id. (quoting Savantage, 595 F.3d at

1285).  An agency's decision is "arbitrary and capricious when the agency 'entirely failed

to consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or [the decision] is so implausible

that it could not be ascribed to a difference in view or the product of agency expertise.'"

Alabama Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed.

Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.

Ins. Co., 463 U.S. 29, 43 (1983)).  In the context of reviewing an agency's price realism

analysis, the court's duty is "to determine whether the agency's price-realism analysis

was consistent with the evaluation criteria set forth in the RFP . . . not to introduce new

requirements outside the scope of the RFP." Id. at 1375-76 (citing Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)).  Adding to or rewriting the RFP "amount[s] to an impermissible substitution of the court's judgment for the agency's with regard to how the contract work should be designed." Id. at 1376 (citing Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43).

## V.  Discussion

At issue in this case is the agency's determination, in its fourth evaluation of KWR's price proposal, that KWR's offer reflects a lack of understanding of the demonstration project requirements.  The June 26, 2015 SSDD does not describe how the agency determined that KWR's post-Amendment 9 price proposal is unrealistic.  However, the reference in the SSDD to the "[d]etails pertaining to the individual elements of the price evaluation" in the proposal analysis report indicates that the applicable rationale is found in Ms. Woo and Mr. Hinsch's summary in the June 26, 2015 proposal analysis report.[13]

---

[13] The agency has undertaken three evaluations of KWR's post-Amendment 9 price proposal and has changed its reasoning with regard to its completeness, reasonableness, and realism in each of these reviews.  The court has focused its attention on the June 26, 2015 proposal analysis report referenced in the SSDD.

**A.      The Government's Conclusion that KWR did not Understand the
         Requirements of the Demonstration Project and Elimination of KWR
         from the Competition was Arbitrary and Capricious.**

**1.      The Government's Price Realism Analysis was not Consistent
         with the RFP's Requirement to Evaluate "the Individual Line
         Items of the Demonstration Project Proposal."**

The RFP in this case required the agency to conduct a price realism analysis.  AR

183, 186.  The FAR does not define "price realism analysis."  However, courts have

noted that an agency may use a price realism analysis "to measure an offeror's

understanding of the solicitation requirements, or to avoid the risk of poor performance

from a contractor who is forced to provide goods or services at little or no profit."  Am.

Safety Council, Inc v. United States, 122 Fed. Cl. 426, 438 (2015) (quoting Ceres Envtl.

Servs., Inc. v. United States, 97 Fed. Cl. 277, 303 (2011).  Generally, a price realism

analysis "examines the performance risk of proposals in a fixed-price contract

procurement, with particular attention to the risk of low-priced proposals, and may

include the cost realism analysis referenced in FAR 15.404-1(d)."  DMS All-Star Joint

Venture v. United States, 90 Fed. Cl. 653, 663 (2010) (citations omitted); see also Ralph

C. Nash, Postscript:  Price Realism, 29 NASH & CIBINIC REP. 8 ¶ 43 (2015); Vernon J.

Edwards, Price Realism:  A Primer, 28 NASH & CIBINIC REP. 1 ¶ 1 (2014) ("[I]n common

usage a cost realism analysis performed in a fixed-price acquisition is called a price

realism analysis.").  FAR 15.404-1(d)(1) defines "cost realism analysis" as:

> [T]he process of independently reviewing and evaluating specific elements
> of each offeror's proposed cost estimate to determine whether the estimated
> proposed cost elements are realistic for the work to be performed; reflect a
> clear understanding of the requirements; and are consistent with the unique

methods of performance and materials described in the offeror's technical proposal.

In addition, FAR 15.404-1(d)(3) provides that:

Cost realism analyses may . . . be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors' proposed costs have resulted in quality or service shortfalls.  Results of the analysis may be used in performance risk assessments and responsibility determinations.  However, proposals shall be evaluated using the criteria in the solicitation, and the offered prices shall not be adjusted as a result of the analysis.

Therefore, the court looks at whether the agency's price realism analysis was consistent with the requirements of the RFP.

This court has found that "the nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 358 (2009).  Moreover, a court may not add requirements beyond the scope of the solicitation.  See Alabama Aircraft, 586 F.3d at 1375-76.  The government asserts that the RFP in this case did not require any particular methodology for its price realism analysis and that the use of "may" in the solicitation's provision that "[u]nrealistically low or high prices may be grounds for eliminating a proposal from competition on the basis that the offeror does not understand the requirement," makes the agency's price realism determination for each offer entirely discretionary.  Def.'s Reply 18 (quoting AR 186 and citing Barton v. Adang, 162 F.3d 1140, 1144 (Fed. Cir. 1998), in which the Federal Circuit interpreted the permissive term "may" in a statute to grant discretion).  KWR argues that the RFP required the agency to

evaluate price realism at the line item level as opposed to assessing whether total proposed prices are both reasonable and realistic.  Specifically, KWR argues that the agency, in looking at total price or subtotals for each category of costs, performed the analysis required for the price reasonableness determination set forth in the RFP, which required the agency to compare "total evaluated price . . . to historical prices for similar efforts, . . . [and] to the [IGE], and [consider] price competition obtained by the other offerors' proposals submitted in response to this RFP," and not the analysis required for price realism.  AR 186.  With respect to price realism, the RFP stated that "[t]he [g]overnment will evaluate the individual line items of the demonstration project price proposal to determine whether prices are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the various elements of the offeror's technical proposal."  AR 183.  According to KWR, if the agency had complied with the RFP's line item analysis approach, the agency would have found that KWR priced each item in its approved technical proposal and that KWR understood the demonstration project requirements.[14]

The court agrees with KWR that the agency committed to a methodology for conducting a price realism analysis in the solicitation and that the agency did not follow that methodology in evaluating and rejecting KWR's proposal.  The RFP provided that the government would determine price <u>realism</u> based on an evaluation of "the individual

---

[14] In this connection, KWR notes that the "missing" items identified in earlier evaluations were not included in the latest evaluation.  Specifically, the agency expressly found that KWR's price proposal is complete.  <u>See</u> AR 6068.

line items of the demonstration project proposal." Id.  In contrast, the RFP stated that the government would assess price reasonableness based on a comparison of each offeror's total proposed price to historical prices for similar efforts and to the IGE, and a consideration of price competition obtained by other offers.  AR 186.

The agency's comparisons of KWR's total proposed price and total direct costs to the IGE and the average for technically acceptable offers apply the RFP's price reasonableness criteria to the evaluation of price realism.  This distinction is important in this case because a substantial portion of the gap between KWR's total proposed price and the IGE's total price is due to acknowledged errors in the IGE.  For example, as the government acknowledges, the IGE was not revised to reflect amendments to the solicitation.  In particular, the total price in the IGE includes at least [ . . . ] in design work that was removed from the demonstration project.  AR 3 (line 8).  In addition, the total demonstration project price listed in the IGE includes [ . . . ] that is not explained in the record.  AR 2.  Finally, the elimination of unnecessary direct costs in the IGE would also reduce the percentage-based indirect costs for profit, overhead, tax, and bonding.  KWR's total evaluated price includes [ . . . ] less than the IGE for indirect costs of overhead, profit, tax, and bonding.[15]  In <u>Afghan American Army Services Corp. v. United States</u>,

_____

[15] One of the awardees, Premier, proposed even lower overhead and profit and did not include any cost associated with tax or bonding.  <u>See</u> AR 958.  Yet, the government approved Premier's price proposal as realistic without comment.  <u>See</u> AR 1192-95, 6042.  "While 'the risk of poor performance when a contractor is forced to provide service at little or no profit is a legitimate concern in evaluating proposals,' . . . the presence of a low profit rate does not necessarily dictate that a price is unrealistic, especially in a fixed-price contract."  <u>CRAssociates, Inc. v. United States</u>, 95 Fed. Cl. 357, 381 (2010) (citing <u>Joint Venture of Penauille/BMAR & Assocs.</u>, B-311200 et al., 2008 CPD ¶ 118 (Comp. Gen. May 12, 2008)).  In addition, "below-cost offers, also known as 'buy-in' offers, are not prohibited, and . . . a price realism analysis will not

the court found that an agency failed to conduct a sufficient price realism analysis by relying on an IGE that included "irrational assumptions or critical miscalculations."  90 Fed. Cl. at 359.  In that case, the agency erred by making awards to low priced offerors based on a comparison of proposed prices to an IGE that incorrectly excluded a category of work covered in the proposals.  Id.  In this case, the government rejected KWR's low priced offer based, in part, on a comparison to an IGE that includes costs which should have been removed.[16]

The June 26, 2015 proposal analysis report also claims that the agency was most concerned with the "vast departure from comparison points" with regard to electrical work and that while the other differences might not be significant, KWR's pricing for electrical work reflects a lack of understanding of the demonstration project requirements.  AR 6038.  This conclusion appears to be based on a comparison of KWR's subtotal for electrical work to the subtotal for electrical work in the IGE.  See AR

_____

necessarily reject below-cost offers from consideration."  DMS All-Star Joint Venture, 90 Fed. Cl. at 668 n.16 (citing Ralph C. Nash & John Cibinic, Price Realism Analysis: A Tricky Issue, 12 NASH & CIBINIC REP. 7 ¶ 40 (1998)); see also CRAssociates, 95 Fed. Cl. at 381 n.24 (citations omitted).

[16]  The court agrees with the government that these errors do not necessarily show that the IGE is fundamentally flawed.  However, this does not mean that the errors are "so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are."  Andersen Consulting v. United States, 959 F.2d 929, 935 (Fed. Cir. 1992).  The amount for design work and the unexplained amount in the IGE together are nearly [ . . . ] of the [ . . . ] gap between KWR's total evaluated price and the IGE and approximately [ . . . ] of the [ . . . ] gap in direct costs between KWR's proposal and the IGE.

6034 (Table D).[17]  While the June 26, 2015 proposal analysis report shows which line items in KWR's price proposal the agency counted as electrical work, there is no discussion of whether any of the electrical line items are priced realistically in comparison to line items in the IGE.  At oral argument, counsel for the government also acknowledged that the only SSEB evaluator who commented on KWR's understanding of the demonstration project requirements discussed subtotals for mechanical work and electrical work but did not evaluate costs for individual line items.  See AR 5982; Oral Arg. Tr. 11-12.

Therefore, the court finds that the agency did not comply with the RFP and that this error was prejudicial to KWR.  The RFP did not give the agency discretion to ignore its obligation to look at individual line items in making its decision and, had the agency conducted a line item analysis, as KWR argues and as discussed below, the agency would have seen that its concerns about KWR's understanding of the demonstration project requirements were not supported.

2.      **The Government's Determination that KWR's Price Proposal did not Reflect a Clear Understanding of the Demonstration**

---

[17] The June 26, 2015 proposal analysis report includes a comparison of KWR's total price to the average total price for the awardees, AR 6034; however, Ms. Woo and Mr. Hinsch's summary does not describe whether or how the government compared KWR's prices for electrical work to the prices listed in offers that were determined to be realistic.  AR 6037-38.  There is no table in the proposal analysis report that compares KWR's price for electrical work to other offerors' prices for electrical work.  AR 6034-35.  The three SSEB evaluators' comments from June 23, 24, and 25, 2015 also do not reflect a comparison of KWR's price proposal—for electrical work specifically or for any other demonstration project work—to other offerors' price proposals or the average for technically acceptable offers.  AR 5976-83.  Therefore, there is no basis in the record for the government's conclusion that KWR's proposed price for electrical work was vastly different from "comparison points," AR 6038, that include the price proposals of the other technically acceptable offers.

**Project Requirements was Arbitrary and Capricious because it is not Supported by the Record.**

The government's determination that KWR's price proposal did not reflect a clear understanding of the demonstration project requirements was also arbitrary and capricious in light of the agency's determination that KWR's technical proposal was acceptable, that KWR's price proposal was complete and reasonable, that KWR's pre-Amendment 9 price was realistic, and that KWR's past performance previously merited a rating of "substantial confidence."

The agency determined that KWR's proposal "clearly shows a technical understanding of the demonstration project." AR 6011, 6067. Yet, the agency determined that KWR's price proposal shows that KWR does not understand the requirements of the demonstration project. AR 6033-38, 6068. The government argues that the agency's conclusions are not mutually inconsistent because KWR's price offer does not reflect an "economic understanding" of the demonstration project requirements. Oral Arg. Tr. 32-33. Specifically, the June 26, 2015 proposal analysis report reflects a concern with regard to a lack of understanding of the demonstration project requirements "as it relates to pricing." AR 6037. However, there is no reference to "economic understanding" in the RFP, which speaks only to the rejection of proposals based on the offeror's failure to "understand the requirement." AR 186. Moreover, as discussed below, the government's concern with economic understanding seems to relate to risk or responsibility, which raises issues about the role of the SBA. Further, the issue of economic understanding is particularly unnecessary here because the agency knew that

KWR was an electrical contractor, AR 5994, and had given KWR a performance

confidence rating of "substantial confidence" based on the agency's earlier evaluation of

its recent and relevant performance.  AR 1953 n.4.  Indeed, KWR claims, and the

government does not dispute, that it has performed other projects at Luke AFB.  See, e.g.,

Def.'s Resp. & Cross-Mot. 41-42.  The agency also rated KWR's project manager (an

electrical engineer) and superintendent "outstanding" and rated KWR's quality control

manager and safety manager "good."  AR 783-90, 6011-12.

In addition, the agency's criticism of KWR's reliance on other work at Luke AFB

as a reason for lowering its prices does not equate to KWR not understanding the work.

The June 26, 2015 proposal analysis report states that KWR made "significant reductions

[to project management costs] that were not explained" and concludes that KWR made

assumptions regarding other contracts at Luke AFB that "would help reduce potential

[project management] costs" but "relying on other projects increases the risk of an under-

supervised development project."  AR 6038.  The proposal analysis report states that

"[p]rices based on such assumptions are not realistic as other projects and task orders are

not predictable" and that the rates listed for project management "are neither consistent

with the reduction rationale nor realistic of a rate paid for these construction supervisor

positions in Phoenix, Arizona."  Id.[18]  However, even if KWR's reliance on other projects

---

[18] In its pre-Amendment 9 offer, KWR proposed [ . . . ] for a project manager ([ . . . ] per hour for 253 hours), [ . . . ] for a superintendent ([ . . . ] per hour for 600 hours), [ . . . ] for a safety and quality control manager ([ . . . ] per hour for 199 hours), and [ . . . ] for general labor ([ . . . ] per hour for 56 hours).  AR 677.  In its response to Amendment 9, KWR proposed [ . . . ] for the project manager ([ . . . ] per hour for 253 hours), [ . . . ] for the superintendent ([ . . . ] per hour

is inappropriate, the fact remains that KWR's post-Amendment 9 project management costs are higher than those in the IGE.[19]  For example, KWR proposed [ . . . ] for its project manager position, at a rate of [ . . . ] per hour for 253 hours, AR 781, while the IGE included only [ . . . ] for a project manager, at a rate of [ . . . ] per week for 4 weeks, or [ . . . ] per hour for 160 hours.  AR 3.  In addition, the resumes KWR provided in its original submission, AR 622-28, and in its response to Amendment 9, AR 783-90, show that KWR's only proposed management change was for its safety and quality control manager position.

Other reductions in KWR's price proposal do not appear to have raised concerns. For example, the largest change was in the amount KWR proposed for HVAC equipment.  See AR 6035 (line 2 of Table F, listing a decrease from [ . . . ] to [ . . . ]). However, the June 26, 2015 proposal analysis report states that "[i]ndividually, Mechanical and General Conditions do not render serious concern when compared to the averages."  AR 6038.  The second largest change was in the amount for electrical load studies.  See AR 6035 (line 4, listing a decrease from [ . . . ] for four studies to [ . . . ] for one study).  But, the agency did not find that the reduced amount is unrealistic and the IGE appears to include only [ . . . ] for comparable work.  See AR 7 (line 15, "power

---

for 600 hours), [ . . . ] for the safety and quality control manager ([ . . . ] per hour for 199 hours), and [ . . . ] for general labor ([ . . . ] per hour for 56 hours).  AR 781.

[19] Under the heading for general conditions, the IGE includes [ . . . ] for a project manager (at a rate of [ . . . ] per week for 4 weeks, or [ . . . ] per hour for 160 hours), [ . . . ] for a superintendent (at a rate of [ . . . ] per week for 4 weeks, or [ . . . ] per hour for 160 hours), and [ . . . ] for a field clerk (at a rate of [ . . . ] per week for 4 weeks, or [ . . . ] per hour for 160 hours).  AR 3.

recording and report").  Finally, even with respect to the reduction in price for electrical

work, which Ms. Woo and Mr. Hinsch identified as their primary concern, a line item

analysis would have shown that the APC Equipment/PDU/UPS/Racks, which were found

to have been "realistic" in the first evaluation were reduced by only [ . . . ], or [ . . . ],

following Amendment 9.  See AR 6035 (line 14).  The government is not bound by its

earlier evaluation; however, when a source selection authority makes a significant change

to a rating for "essentially the same proposal, submitted by the same offeror, under the

same solicitation," upon re-evaluation, the source selection authority must provide "some

sort of explanation, or otherwise arrive at an understanding, especially where there were

significant rating differences in the respective evaluations."  eAlliant, LLC, B-407332.6

et al., 2015 CPD ¶ 229 (Comp. Gen. Jan. 14, 2015) (citing CIGNA Gov't Servs., LLC, B-

401062.2 et al., 2010 CPD ¶ 283 (Comp. Gen. May 6, 2009).[20]

---

[20] In addition to the grounds discussed above, the June 26, 2015 proposal analysis report states that KWR's offer was unacceptable because KWR "did not adequately detail all of its price reductions as a result of Amendment 0009, nor did it adequately detail the rationale for the reductions." AR 6038.  It is not clear what reductions the government believes KWR failed to capture in its response to Amendment 9.  The revised construction cost breakdown form that KWR provided appears to detail all of its price reductions and KWR's price proposal was rated complete.  See AR 781-82.  Additionally, it is not clear from the RFP or Amendment 9 why the level of detail in KWR's explanation is insufficient.  KWR's narrative explanation that its costs changed to reflect current commodity conditions and labor hour estimates, as well as reduced overhead and profit, is brief but directs reviewers to look at material costs, changes in labor hours, and reductions to indirect costs.  KWR's explanation is also more specific than the explanation provided by the only awardee whose prices changed.  Rore's response to Amendment 9 stated that costs for certain items had been reduced and that "we optimized our schedule and consequently reduced our General Conditions."  AR 1138.

In sum, for the reasons stated above, the court finds that the agency's conclusion that KWR's price did not reflect a clear understanding of the requirements of the demonstration project and could thus be rejected is not supported by the record.

       **3.**      **The Government's Concerns that KWR Cannot Perform the Demonstration Project at the Price Proposed Must be Referred to the SBA.**

This case deals with the intersection between the agency's discretion to consider risk and responsibility factors as part of the proposal evaluation process and the SBA's authority to determine whether a small business offeror is "responsible."  Generally, if a contracting officer determines that "an apparent successful small business offeror lacks certain elements of responsibility," the contracting officer must refer the matter to the SBA, which will decide whether to issue a "certificate of competency."  FAR 19.602-1(a); see also 15 U.S.C. § 637(b)(7); FAR 9.104-1 (defining the elements of responsibility); Colonial Press Int'l, Inc. v. United States, 788 F.3d 1350, 1355-58 (Fed. Cir. 2015).  See generally 13 C.F.R. § 125.5 (SBA regulations describing the certificate of competency program).

KWR argues that the agency could not avoid the requirements of the Small Business Act and the FAR by eliminating KWR based on an evaluation of responsibility factors.  KWR claims that the agency's criticisms of KWR's price proposal reflect concerns about responsibility that should be referred to the SBA because the solicitation was set aside for section 8(a) small businesses and KWR is a small business.  KWR relies on several cases from this court and the GAO in support of its contention.  For example, in Virgin Islands Paving, Inc. v. United States, the court found that referral to the SBA

for a responsibility determination was appropriate if "the [agency] was worried not about [potential mistakes in the offeror's low] bid, but about [the offeror's] ability to perform." 103 Fed. Cl. 292, 306 (2012) (distinguishing Centech Grp., Inc. v. United States, 554 F.3d 1029 (Fed. Cir. 2009), in which the Federal Circuit held that the government was justified in ignoring an SBA responsibility determination where the offeror did not agree to comply with the requirements of the solicitation).  The government argues that referral to the SBA is not necessary either because the agency did not consider responsibility factors under the price realism analysis or because the agency considered responsibility factors without making a de facto responsibility determination.  Def.'s Reply 2-7, Oral Arg. Tr. 46-53.

The court agrees with KWR that at bottom the agency's concerns with KWR's proposal relate to KWR's responsibility rather than with KWR's understanding of the requirements, as provided for in the RFP.  This court and the GAO have previously recognized that responsibility criteria can be used in a comparative evaluation of proposals but that an agency makes a de facto responsibility determination, requiring referral to the SBA, "when 'responsibility-type concerns preclude a comparative or trade-off analysis.'"  PlanetSpace Inc. v. United States, 96 Fed. Cl. 119, 128 (2010) (citing PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 546 (2010); Capitol CREAG LLC, B-294958.4, 2005 CPD ¶ 31 (Comp. Gen. Jan. 31, 2005)); see also Zolon Tech, Inc., B-299904.2, 2007 CPD ¶ 183 (Comp. Gen. Sept. 18, 2007).  For example, in Optimization Consulting, Inc. v. United States, the agency considered responsibility factors in rating the plaintiff "marginal," but not "unawardable," for "mission capability" and then

eliminated from the competitive range offers that did not receive a rating of

"outstanding" or "good" on that factor.  115 Fed. Cl. 78, 100-01 (2013).  The court found

that the agency had eliminated the plaintiff from the competitive range based on an

"extensive" comparative evaluation that ranked eligible offerors.  Id. at 101.  Therefore,

there was no basis for finding that the plaintiff was entitled to a referral to the SBA for a

responsibility determination.  Id.  In this case, the agency eliminated KWR based on a

price realism evaluation rating, not based on a comparison of KWR's technical proposal

or price with other proposals found to be eligible.  AR 6068.

The court also recognizes that an agency may provide in a solicitation that it will

consider, as part of a price realism analysis, the risk of poor performance by a contractor

that proposes to provide goods or services at little to no profit.  See CRAssociates, 95

Fed. Cl. at 381; see also Int'l Outsourcing Servs., LLC, B-295959, 2006 CPD ¶ 6 (Comp.

Gen. May 25, 2005) ("[A]n agency may provide in the solicitation for a price realism

analysis for such purposes as measuring an offeror's understanding of the solicitation

requirements, or to avoid the risk of poor performance from a contractor who is forced to

provide goods or services at little or no profit.").  But see Int'l Outsourcing Servs., L.L.C.

v. United States, 69 Fed. Cl. 40, 47 (2005) ("[U]ltimately, it was not plaintiff's price, but

its incomplete answers to the requests that led to the demise of its proposal.").  Also, the

FAR allows an agency to use the results of a cost realism analysis in performance risk

assessments and responsibility determinations.  See FAR 15.404-1(d)(3).  However, the

FAR emphasizes that the agency must evaluate proposals using the criteria in the

solicitation.  Id.  Here, the RFP only provided that the agency would use results from the

price realism analysis to eliminate an offeror from the competition "on the basis that the

offeror does not understand the requirement."  AR 186.  Nonetheless, the agency relied

on the "loss of time, money and potential delays due to the potential for contractor

default" and the "risk of an under-supervised development project," AR 6037-38, to

reject KWR's proposal.  This action precluded a comparative or trade-off analysis that

included KWR.[21]

　　　　If the agency had rejected KWR based on the ground stated as part of a trade-off

analysis, the agency's determination might have been sustained.  The RFP stated that the

agency could award a contract "to a higher rated, higher priced offeror, where the

decision is consistent with the evaluation factors and the [agency] reasonably determines

that the technically acceptable, superior past performance of the higher priced offeror

outweighs the price difference."  AR 183.  However, by rejecting KWR's proposal

outright based on responsibility concerns, the agency's decision amounted to a de facto

responsibility determination which should have been referred to the SBA.

---

[21] The government argues, briefly, that the agency's decision was made on a "comparative basis"
because the agency compared KWR's price proposal to the IGE and other offers.  Def.'s Reply
5-6.  However, the record shows that the agency eliminated KWR's offer as ineligible due to an
unrealistic price proposal.  AR 6068; cf. Optimization Consulting, 115 Fed. Cl. at 100-01
("[W]here traditional 'responsibility' factors are employed as technical evaluation criteria and
the evaluation renders an offeror's proposal flatly ineligible for award, 'the agency has
effectively made a determination that the small business offeror is not a responsible contractor
capable of performing the solicitation requirements.'" (citing Capitol CREAG, B-294958.4)).
Here, it is not disputed that the agency did not consider KWR's overall proposal in comparison
to the proposals that were accepted.

## B.     Injunctive Relief is Warranted.

In deciding whether to grant permanent injunctive relief, a court considers:
(1) whether the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff
will suffer irreparable harm if the court withholds injunctive relief; (3) whether the
balance of hardships to the respective parties favors the grant of injunctive relief; and
(4) whether it is in the public interest to grant injunctive relief.  Centech Grp., 554 F.3d at
1037 (citing PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).

In this case, KWR has succeeded on the merits.  Therefore, the court must
consider whether KWR will suffer irreparable harm if the court withholds injunctive
relief, whether the balance of hardships to the respective parties favors the grant of
injunctive relief, and whether the public interest is served by a grant of injunctive relief.
Centech Grp., 554 F.3d at 1037.

"When assessing irreparable injury, '[t]he relevant inquiry . . . is whether plaintiff
has an adequate remedy in the absence of an injunction.'"  PGBA, LLC v. United States,
57 Fed. Cl. 655, 664 (2003) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446,
447 (1993)); see also Caddell Constr. Co. v. United States, 111 Fed. Cl. 49, 114 (2013)
(quoting CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, at 494 (2013)).  The
government argues that KWR has not shown irreparable injury because, the government
asserts, economic harm alone is not typically sufficient to establish irreparable injury.
See Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997) (citing Zenith
Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)).  In addition, the
government argues that even if KWR is awarded a contract under the solicitation at issue,

it is not guaranteed any task order awards so any claim of lost profit is speculative. See
Def.'s Resp. & Cross-Mot. 41. Also, the government asserts, KWR's gain from being
awarded a contract under this solicitation would be marginal because KWR holds other
construction project contracts in and around Luke AFB. See id. at 41-42. KWR argues
in response that the lost opportunity to compete on future task orders and other contracts
will cause irreparable harm. The court agrees with KWR. This court has found
irreparable injury in similar circumstances. See, e.g., Caddell Constr., 111 Fed. Cl. at
115-16 ("Because without an injunction, plaintiff would suffer a substantial loss of
profits resulting from a lost opportunity to compete in a fair and competitive procurement
process, as well as the loss of valuable performance experience, the court finds that
plaintiff would be irreparably harmed if the court denied the plaintiff's requested
injunctive relief."). KWR has lost a valuable business opportunity "deriv[ing] from a lost
opportunity to compete on a level playing field." CW Gov't Travel, 110 Fed. Cl. at 495
(quoting CRAssociates, 95 Fed. Cl. at 390).

    The balance of hardships to the respective parties also favors the grant of
injunctive relief. The government presents no evidence that injunctive relief would
create hardship for the agency. KWR has not requested that the agency set aside any of
the awards or conduct the procurement again. Rather, it wants to be fairly considered for
the fifth contract available under the terms of the RFP. This would then allow KWR to
compete with the four other awardees for task orders. See CW Gov't Travel, 110 Fed.
Cl. at 495 (finding that balance of hardships favored injunctive relief where an IDIQ
contract would allow the plaintiff to compete for task orders); cf. ViON Corp. v. United

States, 122 Fed. Cl. 559, 580 (2015) (finding that balance of hardships did not favor injunctive relief where the defendant-intervenor would not be allowed to perform the contract and the plaintiff would have significantly higher costs); PGBA, 57 Fed. Cl. at 663 ("[O]nly in an exceptional case would [delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests . . . ." (citing Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 399 (1999))).

Finally, the court finds that the public interest is served by a grant of injunctive relief. "Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." PGBA, 57 Fed. Cl. at 663 (citing Cincom Sys., Inc. v. United States, 37 Fed. Cl. 266, 269 (1997); Magellan Corp., 27 Fed. Cl. at 448).

### C.    Injunctive Relief is Tailored to the Circumstances.

This court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). This court has held that it will not intrude upon the contracting authority of the United States by selecting a contractor or awarding specific performance of a contract. See, e.g., FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 401 (2011) (citing MVM, Inc. v. United States, 46 Fed. Cl. 137, 144 (2000); Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 448, 461 (1997)). Remand is the proper course "[w]hen there are facts that remain to be found in the first instance," E.g., Byron v. Shinseki, 670 F.3d 1202, 1206 (Fed. Cir. 2012). "If the record before the agency does not support the agency action, if the agency has not considered all

relevant factors, or if the reviewing court simply cannot evaluate the challenged agency

action on the basis of the record before it, the proper course, except in rare circumstances,

is to remand to the agency for additional investigation or explanation." Florida Power &

Light Co. v. Lorion, 470 U.S. 729, 744 (1985).  This court "is not generally empowered

to conduct a de novo inquiry into the matter being reviewed and to reach its own

conclusions based on such an inquiry." Id.  However, remand for further evaluation may

not be necessary "where the dispute turns only on legal issues . . . [or] where a factual

dispute exists if no further record development is appropriate and the fact is one 'as to

which the evidence is undisputed' or 'is of such a nature that as a matter of law the

[government] could have made only one finding of fact.'" SUFI Network Servs., Inc. v.

United States, 755 F.3d 1305, 1312 (Fed. Cir. 2014) (citing Maxwell Dynamometer Co.

v. United States, 386 F.2d 855, 870 (Ct. Cl. 1967); Collins Int'l Serv. Co. v. United

States, 744 F.2d 812, 816 (Fed. Cir. 1984)).

  KWR's proposal is clearly reflected in the record and, for the reasons stated

above, the court finds that the agency could not rationally have excluded KWR from

consideration for award on the grounds that KWR's price proposal demonstrated a lack

of understanding of demonstration project requirements.  Therefore, the court sets aside

the agency's rejection of KWR's proposal as unrealistic and remands the matter to the

agency for further action consistent with this decision.  Specifically, the agency must

consider whether in comparison to the awardees KWR should also receive an award, or,

if the agency believes KWR should not be considered for award of the fifth contract

based on concerns about KWR's ability to meet contract requirements (in contrast to

concerns about KWR's understanding of contract requirements), the agency must make a responsibility determination and refer the matter to the SBA.  See FAR 19.601 to 19.602-1.

### D.    Bid Preparation and Proposal Costs are not Warranted.

KWR also requests an award of bid preparation and proposal costs.  Under 28 U.S.C. § 1491(b)(2), this court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."  An award of bid preparation and proposal costs "'helps to ensure that the government complies with procurement regulations,' even when the performance of the contract itself cannot be enjoined."  Afghan Am. Army Servs. Corp., 90 Fed. Cl. at 369 (quoting Dynacs Eng'g Co. v. United States, 48 Fed. Cl. 614, 620 (2001)).  However, this court has also stated that bid preparation and proposal costs are a form of reliance damages and are not appropriate where a party has achieved its goal in a bid protest because the costs have not been wasted.  See AshBritt, Inc. v. United States, 87 Fed. Cl. 344, 380, clarified on other grounds, 87 Fed. Cl. 654 (2009). The court finds that bid preparation and proposal costs are not warranted in this case, despite the government's errors in rejecting KWR's offer multiple times, because KWR is entitled to injunctive relief and may yet receive an award.  See, e.g., Afghan Am. Army Servs. Corp., 90 Fed. Cl. at 369.

### E.    KWR May Apply for Attorneys' Fees and Expenses.

Lastly, KWR requests attorneys' fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA").  Under the EAJA, a "prevailing party" in a civil

action against the United States may recover attorneys' fees and other expenses "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."  28 U.S.C. § 2412(d)(1)(A).  The Federal Circuit has explained that "[t]he purpose of the [EAJA] is to ensure that litigants 'will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved.'"  DGR Assocs., Inc. v. United States, 690 F.3d 1335, 1339 (Fed. Cir. 2012) (quoting Scarborough v. Principi, 541 U.S. 401, 407 (2004)).  KWR must submit the necessary application under 28 U.S.C. § 2412(d)(1)(B) and show that it meets the EAJA's requirements before the court can award fees or expenses.

## VI.     Conclusion

For the reasons described above, KWR's motion for judgment on the administrative record is **GRANTED** and the government's cross-motion for judgment on the administrative record is **DENIED**.[22]  The agency's decision to reject KWR's proposal for award consideration is **VACATED** and **REMANDED** to the agency until **Monday, January 11, 2016**.  On remand, the agency must take further action consistent with this opinion.  Pursuant to RCFC 52.2(b), the government shall submit a status report at or before the conclusion of the remand period on the status of the remand proceedings.

---

[22] The court need not reach the other arguments KWR raises in its motion for judgment on the administrative record because of this decision.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge